IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03390-PAB-KHR

RAMONA SMITH,

     Plaintiff,

v.

CHEYENNE MOUNTAIN SCHOOL DISTRICT 12 and
COLORADO DEPARTMENT OF EDUCATION,

     Defendants.
_____

**ORDER**
_____

     This matter is before the Court on plaintiff's Verified Complaint [Docket No. 1],

plaintiff's Opening Brief [Docket No. 18], Defendant Cheyenne Mountain School District

12's Motion for Summary Judgment [Docket No. 26],[1] and Defendant Cheyenne

Mountain School District 12's Request for Telephone Status Conference [Docket No.

30].[2]  Plaintiff appeals the State of Colorado, Office of Administrative Courts' decision

dismissing her claims that Defendant Cheyenne Mountain School District 12 (the

"District") failed to provide her minor son, R.S., with a free appropriate public education

("FAPE").  Plaintiff's claims arise under the under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.  The Court has subject matter

_____

    [1] Pursuant to D.C.COLO.LAPR 16.1(b), "[m]otions for summary judgment shall
not be filed" in AP cases.  Additionally, the motion for summary judgment [Docket No.
26] repeats the same arguments found in the same party's response brief [Docket No.
20].  Accordingly, the Court does not further discuss the summary judgment motion and
will deny it.

    [2] Because this order resolves the case, the Court will deny the motion for a
status conference as moot.  *See* Docket No. 30.

jurisdiction under 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A). [3]

## I. FACTUAL BACKGROUND

R.S. is a school-age child with disabilities. He has been diagnosed with several conditions that result in academic challenges for him. The primary disability identified in R.S.'s Individualized Education Plans ("IEP") is autism spectrum disorder. R. at 39, 74. R.S. has also been diagnosed with attention deficit hyperactivity disorder ("ADHD") and hypotonia. R. at 27.

R.S. is a resident of the Falcon School District 49. R. 391, ¶ 2. In 2013, under Colorado's Public Schools of Choice Law, Colo. Rev. Stat. § 22-36-101 et seq. (the "School Choice law"), R.S. applied to attend the Cheyenne Mountain Charter Academy (the "Academy") for the 2013-14 school year. R. at 392, ¶ 5. The Academy is located in the District). *Id*. When they accepted R.S., the Academy and the District were both aware that R.S. had an IEP that had been developed while he was attending school in Falcon School District 49.

Soon after the start of the 2013-14 school year, when R.S. was enrolled in kindergarten, the Academy determined the R.S.'s preexisting IEP was insufficient to meet his needs. R. at 392, ¶ 6. With the permission of R.S.'s parents, the Academy reevaluated R.S. and developed a new IEP, dated November 7, 2013 (the "November 2013 IEP"). *Id*.; R. at 22. The November 2013 IEP included a behavior intervention plan ("BIP") and stated that R.S. "needs intensive support for instruction and

---

[3] In light of plaintiff's pro se status, the Court construes her filings liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 & n.3 (10th Cir. 1991).

supervision for safety throughout his day which will be provided by special education staff and/or paraprofessional on an individual and small group basis." R. at 45, 53.

In early 2014, Ward Barr, the Academy's Principal, had concerns about whether the Academy would need to hire additional staff to provide one-on-one support to R.S. during the 2014-15 school year, which would be R.S.'s first-grade year. R. at 392, ¶ 10. Under Mr. Barr's interpretation of the School Choice law, the Academy was not required to re-enroll a student if it would have to hire additional staff. *Id.* Mr. Barr scheduled a meeting to address this issue. *Id.*, ¶ 11. On February 28, 2014, R.S.'s special education teacher, Richard Tran, sent an email to plaintiff inviting her to attend the meeting. R. at 393, ¶ 12. Mr. Tran's email stated that the purpose of the meeting was to "discuss the next steps in preparation for [R.S.'s] first grade year." Docket No. 25-1 at 48.

The meeting occurred on the morning of March 12, 2014. R. at 393, ¶ 13. Mr. Barr, Mr. Tran, and Ms. Smith attended, as well as Karen Higgins, the District's Director of Special Education, and Amy Stephens, R.S.'s kindergarten teacher. R. at 393, ¶ 13. At the meeting, Mr. Barr told Ms. Smith that R.S. "continued to require one-on-one support to access general education and a high level of adult prompting" and that, under the School Choice law, the District could "deny enrollment to students from another school district if additional staff would need to be hired." Docket No. 25-1 at 49. Ms. Smith was also told that the Academy planned to "decrease the level of adult prompting to see if [R.S.] could more independently access the general setting and remain safe." *Id.* Academy staff also told Ms. Smith that the IEP team was concerned that R.S. was becoming dependent on prompting by his adult helper and that data

would be collected to determine "if the level of prompting needed [by R.S.] could be decreased." *Id.*; R. at 393, ¶ 14. Confronted with this, Ms. Smith "expressed concerns that her child would be kicked out" of the Academy. Docket No. 25-1 at 49. The group "tentatively set" a meeting for April or May 2014 to "review [the] IEP, BIP, and data collected." *Id.*

On March 18, 2014, Ms. Smith sent an email objecting to the plan to reduce R.S.'s prompting. R. at 393-94, ¶ 18. Ms. Higgins responded to this email and called Ms. Smith to explain that an aide would remain with R.S., but the aide would "fade" the amount of prompting by gradually reducing the frequency of prompting to determine whether the level of prompting needed by R.S. could be reduced. R. at 394, ¶¶ 19-20.

When the plan to fade prompting of R.S. was implemented, it quickly became apparent that R.S. was dependent on the prompts and would not respond to his teachers' instructions without prompting from his aide. R. at 394, ¶ 22. Therefore, the Academy ceased attempts to reduce the level of prompting provided to R.S. *Id.*

On May 1, 2014, an IEP Team meeting was held for R.S. R. at 394, ¶ 25. The IEP team discussed the results from the plan to reduce prompting and developed a new IEP for R.S. (the "May 2014 IEP"). *Id.* The May 2014 IEP stated that:

> In order to access the general education curriculum, [R.S.] requires continual redirection/prompting and frequent breaks to support sustained attention to academic tasks. [R.S.] requires intensive one-on-one paraprofessional support for academic Instruction, transitions, and to ensure his safety throughout the entire day. Paraprofessional support is needed at all times whenever [R.S.] is not receiving direct services from special education staff[.]

R. at 73, § 13. R.S. completed the school year at the Academy under the May 2014 IEP, and he received extended school year services into the summer of 2014. R. at

395, ¶¶ 26, 28.

Ms. Smith sought to re-enroll R.S. at the Academy for the 2014-15 school year. R. at 395, ¶ 29. However, on May 22, 2014, Colin Mullaney, the Academy's executive director, sent a letter denying R.S. enrollment. *Id*. He stated that, under the School Choice law, the Academy could deny enrollment to an out-of-district student if the school did not have staff to support that student and that the Academy "would need to hire additional staff to meet [R.S.'s] IEP." R. at 76. On that basis, Mr. Mullaney stated that the District was denying R.S. enrollment in the Academy. *Id*.

## II. PROCEDURAL HISTORY

On July 16, 2014, R.S.'s parents filed a civil rights complaint against the District. R. at 3-6. They alleged four IDEA violations, which were summarized by the Administrative Law Judge ("ALJ"), Robert N. Spencer, as:

> 1. <u>Failure to Appropriately Evaluate</u>: Petitioners alleged that, at the IEP meeting of November 7, 2013, the School District failed to adequately assess and evaluate [R.S.'s] disabilities or adequately consider his need for physical therapy and ABA therapy.

> 2. <u>Failure to Appropriately Supervise</u>: Petitioners alleged that the School District failed to provide the level of supervision required by the IEP, resulting in [R.S.] being "trapped" in a bathroom, being unable to participate in field trips, and becoming "prompt dependent."

> 3. <u>Failure to Provide Appropriate Goals and Assessments</u>: Petitioners alleged that [R.S.'s] IEP failed to include appropriate goals to address identified concerns. The goals that were established allegedly failed to meet CDE standards and proper methodology was not employed to meet the goals. Furthermore, Petitioners alleged that the School District failed to inform them of [R.S.'s] progress in these goals as required by the IEP, and that several goals were subsequently eliminated without explanation. Finally, they alleged that the IEP was deficient because it did not explain why [R.S.] could not participate in regular assessments given to his classmates, but instead provided unjustified accommodations in mode and duration of assessment.

4. <u>Inappropriate Re-evaluation Leading to Denial of Enrollment</u>: Finally, Petitioners claimed that [the Academy] decided to re-evaluate [R.S.] in March 2014 without providing the legally required prior written notice and without their informed consent.

R. at 389-90 (emphasis original).  R.S.'s parents also clarified that they did not "seek to resolve any issue pertaining to [the Academy's] decision fo refuse readmission to our disabled son."  R. at 5, n.1.

On August 1, 2014, the District filed a notice of insufficiency and motion to dismiss the complaint as unsupported by the evidence.  R. at 9-20.  On August 6, 2014, the ALJ issued an order finding the complaint sufficient, but he reserved judgment on the motion to dismiss.  R. at 86-89.  On August 19, 2014, the ALJ, without notifying the parties that he intended to do so, converted the motion to dismiss into a motion for summary judgment, found no genuine issue of material fact on the first three alleged IDEA violations, and granted summary judgment on those allegations.  R. at 126-31.

On September 17, 2014, the ALJ held a due process hearing on the remaining, fourth allegation.  R. at 390.  On September 23, 2014, the ALJ issued a written decision, finding that the "undisputed evidence . . . was that [R.S.] was never denied the paraprofessional support required by his IEP, that he suffered no loss of educational benefit as a result of the fading plan, and that he did make significant progress during his kindergarten year both socially and academically."  R. at 399.  The ALJ, therefore, dismissed the complaint.  *Id*.  This appeal followed.

## III.  INDIVIDUALS WITH DISABILITIES IN EDUCATION ACT

The IDEA provides students with disabilities the right to a FAPE designed to meet their needs.  *See* 20 U.S.C. § 1400(d)(1)(A).  The determination of whether a

FAPE has been provided turns in large part on the sufficiency of the IEP for each disabled child. *See, e.g.*, *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 675 (4th Cir. 2007) ("A school provides a FAPE by creating an [IEP] for each child."). Challenges to the adequacy of an IEP can take two forms, i.e., arguments that the IEP was procedurally deficient or that it was substantively deficient. *See Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 726 (10th Cir. 1996).[4] Here, the plaintiff has not challenged whether her child's IEPs were substantively deficient, but rather focuses on the District's compliance with IDEA procedures in creating and implementing the November 2013 IEP and in creating the May 2014 IEP.

A FAPE is "hardly self-defining." *Thompson R2-J School Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 (10th Cir. 2008). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). To determine whether a FAPE was provided to plaintiff during the 2013-2014 school year, the Court "must ask . . . whether [the] . . . IEP was 'reasonably calculated to enable [him] to receive educational benefits.'" *Thompson*, 540 F.3d at 1148-49 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)). "If the IEP was so calculated, the school district

---

[4] *Cf. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) ("[T]he congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.").

can be said to have provided a FAPE; if not, then not." *Id.* at 1149.[5]

## IV. STANDARD OF REVIEW

Plaintiff, as the party challenging the procedures related to the IEP, bears the burden of proof to show they were deficient. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005). In determining whether plaintiff has met her burden, the Court "shall receive the records of the administrative proceedings;" "shall hear additional evidence at the request of a party;" and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The Court reviews legal challenges *de novo*, without deference. *See O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998). However, "though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative

---

[5] In certain circumstances, if a FAPE has not been made available, parents are entitled to enroll their children in private school and seek reimbursement of the costs. Specifically, the IDEA provides:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii). Furthermore, the IDEA requires that disabled children be educated in the "least restrictive environment" ("LRE"). 20 U.S.C. § 1412(a)(5)(A). In other words, "[t]o the maximum extent appropriate," disabled children should be educated in public school classrooms alongside children who are not disabled. 20 U.S.C. § 1412(a)(5)(A).

proceedings, the fact findings of which are considered prima facie correct." *Thompson*,

540 F.3d at 1150 (citation and quotation marks omitted).[6]

## V.  DISCUSSION[7]

### A.  Failure to Join an Indispensable Party

As an initial matter, the Court addresses the District's argument that plaintiff's

claims must be dismissed because plaintiff's husband, who participated in the

administrative proceedings, is not a party to this proceeding.  The District argues that

"Scott Smith is not a party to this appeal, as required by Fed.R.Civ.P. 19(a)(I)(A) [sic],

and this appeal should therefore be dismissed for failure to join a necessary party."

Docket No. 20 at 5.  The District does not explain why "in [Mr. Smith's] absence, the

court cannot accord complete relief among existing parties," Fed. R. Civ. P. 19(a)(1)(A),

or why, even if that were true, it would be improper "in equity and good conscience" for

the case to proceed nonetheless.   Fed. R. Civ. P. 19(b).  Because this case concerns

primarily R.S.'s rights and there is no indication that Mr. Smith's position is different

from plaintiff's position with respect to their child's rights, the Court finds that Mr. Smith

_____

[6] The Tenth Circuit describes this "somewhat unique standard of review" as a "modified *de novo* standard." *Thompson*, 540 F.3d at 1149 (citations and quotation marks omitted). *Thompson* notes that, while the "modified *de novo*" standard of review "represents the distinct minority position among circuit courts" and that "[e]n banc reconsideration of [the] standard of review may well be appropriate," the standard of review would not affect the outcome in the case because its "disagreement with the district court . . . is limited solely to the legal question [of] what consequences follow under IDEA's terms from its factual findings. *Id.* at 1150 n.6

[7] The District repeatedly asserts that plaintiff's "fundamental complaint" is something other than the issues raised in this appeal, namely, the District's decision to deny enrollment to R.S. pursuant to School Choice law, Colo. Rev. Stat. § 22-36-101 et seq. *See, e.g.*, Docket No. 20 at 5.  This argument is irrelevant to the issues before the Court.

is not an indispensable party and that it would be proper to proceed even if he were.

### B. Waiver

The District claims that plaintiff failed to raise the arguments she now raises during the administrative proceedings and argues that plaintiff should not be allowed to raise such "completely new" arguments. Docket No. 20 at 11. In particular, the District claims that plaintiff did not argue that the "District denied R.S. [a] FAPE by 'predetermining' that it would not provide him with paraprofessional support during his first grade year," *id*., and did not argue that R.S. became more prompt dependent. *Id*. at 15.

The District's waiver claims are contrary to the record, which shows that plaintiff raised both arguments during the administrative proceedings. While plaintiff does not use the specific word "predetermined," plaintiff's due process complaint argues that the District's actions were part of a plan to remove R.S. from the school because the school was unwilling to provide support for him. R. at 5. Plaintiff raised this issue again in her preliminary injunction motion. R. at 61 ("Principal Barr further stated that if it was determined, at the next IEP Team meeting that [R.S.] could not function in class without his paraprofessional support that [the Academy] would probably not permit [R.S.] to return to [the Academy] for first grade").[8] The due process complaint also claims that R.S. "has become 'prompt dependent'; [he] has been taught, inadvertently, by his

---

[8] Additionally, the District's counsel solicited testimony with the clear purpose of showing that the decision to deny enrollment was not predetermined. Docket No. 25-2 at 131, ll. 16-20 ("Q. If it had been predetermined by the academy that it was going to deny [R.S.]'s enrollment, why would it have had that language in the IEP? A. It wouldn't have."). This belies the District's claim that the issue of whether the decision to remove R.S. was predetermined was not raised at the administrative proceedings.

support person to not engage in any given activity unless so prompted." R. at 4. In his summary of plaintiff's claims, the ALJ recognized that one of plaintiff's allegations was that "the District failed to provide the level of supervision required by the IEP, resulting in [R.S.] . . . becoming 'prompt dependent.'" R. at 87. The Court finds that plaintiff did not waive these issues; the arguments plaintiff presents on appeal are the same as those raised generally in her due process complaint.

Moreover, plaintiff was denied an opportunity to develop her specific arguments on these issues during the administrative proceedings. After the District filed a motion to dismiss during the administrative proceedings, plaintiff declined to respond specifically to that motion, stating that her arguments were contained in her preliminary injunction motion.[9] Then, without warning plaintiff that he intended to do so, the ALJ converted the motion to dismiss into a motion for summary judgment and entered summary judgment on three of the four violations alleged in the due process complaint. R. at 131. The effect of conversion was that plaintiff was not able to present material opposing summary judgment. If a court converts a motion to dismiss into a motion for

_____

[9] Plaintiff perhaps also relied on the ALJ's earlier ruling denying dismissal and holding plaintiff's pleadings were sufficient. He found:

The District contends that the complaint is insufficient because it fails to "include facts relating to the problem," as required by 34 CFR § 300.508(b)(5). The ALJ cannot agree. With respect to each allegation, Petitioners provide one or more examples of the alleged problem. Although the District may dispute the factual accuracy of those allegations, or contest that they amount to a denial of FAPE, those are issues that cannot be resolved on the face of the complaint and therefore do not amount to insufficiency.

R. at 88-89. The ALJ never reconsidered this finding or held that plaintiff's due process complaint did not state a claim.

summary judgment, the Colorado Rules of Civil Procedure require that "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56".  Colo. R. Civ. P. 12(b); *see also Horne Eng'g Servs., Inc. v. Kaiser-Hill Co., LLC*, 72 P.3d 451, 453 (Colo. App. 2003) ("When a court converts a motion to dismiss for failure to state a claim to one for summary judgment, '[i]t is important that the court give the parties notice of the changed status of the motion and a "reasonable opportunity to present all material made pertinent to such a motion by C.R.C.P. 56."  In this way no one will be taken by surprise by the conversion.'" (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 at 501-02 (2d ed.1990), in turn quoting Fed. R. Civ. P. 12(b)(6)).  No such notice with the related opportunity to provide factual support was afforded to plaintiff.[10]  As is apparent in this case, such notice is essential so that the parties can present the evidence necessary to carry the evidentiary burden that exists at summary judgment, but does not exist at the pleadings stage.  In granting summary judgment, the ALJ stated R.S.'s parents "could not rest upon mere allegations," which they would have been able to do for a motion to dismiss, "but were required to provide evidence by affidavit or otherwise sufficient to establish the existence of a genuine dispute."  R. at 130.  While plaintiff does not raise this issue in her appeal briefing, the Court is reluctant to find that plaintiff waived the specific arguments she now presents on appeal because it is unclear what specific

---

[10] The ALJ rejected plaintiff's motion for reconsideration, finding that plaintiff had an opportunity to respond because she was asked if she was "'intending to file anything more in opposition to that motion.'"  R. at 177.  Nowhere does the record indicate that the ALJ gave the parties notice of his intent to convert the motion to dismiss into a summary judgment motion, as required by Colo. R. Civ. P. 12(b).

arguments she would have made during the administrative proceedings if given a full opportunity to develop the general allegations on the same issues contained in the due process complaint.

### C.  Whether R.S. Was Denied a FAPE

In relation to the merits, the parties essentially dispute three issues: (1) whether the District improperly failed to account for R.S.'s disabilities beyond autism in creating the November 2013 IEP, (2) whether the District failed to provide proper support leading to R.S. becoming prompt dependent, and (3) whether the District predetermined R.S.'s placement for his first grade year.  *See* Docket No. 18 at 6.  The Court addresses each of these issues in turn before deciding the ultimate question of whether R.S. was denied a FAPE.

### *1.  Failure to Evaluate R.S. for Additional Disabilities*

Plaintiff argues that the November 2013 IEP improperly focused on R.S.'s autism and did not account for his ADHD, Hypotonia, Sensory Processing Disorder, and Obsessive-Compulsive Disorder.  Docket No. 18 at 6.  Plaintiff claims that the Evaluation Report in the IEP "contained numerous examples of behaviors engaged in by R.S. that are . . . strongly suggestive" of these conditions.  Docket No. 18 at 8.  Plaintiff claims that, by failing to evaluate R.S. for additional conditions and to take them into account in formulating the November 2013 IEP, the District violated the requirement that children suspected of disability be assessed "'in all areas of suspected disability.'"  *Id*. at 15 (quoting 20 U.S.C. § 1414(b)(3)(B)).

The District argues that, even though the November 2013 IEP did not mention

such additional conditions, it was designed to target the behaviors that plaintiff identifies as resulting from those conditions.  Docket No. 20 at 13.  In particular, the District points to the IEP's focus on "Target Behaviors" such as "(1) leaving his seat and/or running indoors; (2) loud laughing or babbling; [and] (3) wadding or tearing of school materials" as "clear examples of ADHD-type behavior" that were addressed in the November 2013 IEP.  *Id*.

Although a failure to consider all of a student's diagnoses could taint the IEP development process and lead to a denial of a FAPE, there is little evidence that it did so here.  *See, e.g., N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula Cty., Mont.*, 541 F.3d 1202, 1210 (9th Cir. 2008).  In particular, the Court is persuaded by the District's argument that, by being directed to R.S.'s behaviors, the November 2013 IEP took into consideration issues presented by diagnoses beyond R.S.'s "Primary Disability" of "13: Autism Spectrum Disorders," which the IEP form requires to be listed.  R. at 39.  The November 2013 IEP indicates that plaintiff made the IEP team aware that R.S. had been diagnosed with ADHD and Hypotonia in addition to Autism.  Docket No. 18-2 at 5 ("Ms. Smith was interviewed in person to support the development of effective behavioral strategies for [R.S.].  She reported diagnoses of Autism, Attention Deficit Hyperactivity Disorder (ADHD), and Hypotonia.").  And the November 2013 IEP's BIP specifies numerous strategies directed at the behaviors that plaintiff identifies in her briefing as characteristic of the diagnoses that she claims the District failed to evaluate and consider.  R. at 45-47.  Thus, there is little reason to believe that a failure to evaluate [R.S.] for conditions he has not been diagnosed with or to specifically reference his other diagnoses prevented the November

2013 IEP from being "reasonably calculated to enable [R.S.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999; *cf. N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d at 1210 (finding an IDEA violation because, "without evaluative information that C.B. has autism spectrum disorder, it was not possible for the IEP team to develop a plan reasonably calculated to provide C.B. with a meaningful educational benefit throughout the 2003-04 school year.").

### 2. *Prompt Dependency*

Plaintiff argues that the District's failure to provide R.S. with an "aide who was certified in techniques to prevent R.S. from becoming prompt dependent" led to him becoming prompt dependent over the 2013-14 school year. Docket No. 18 at 10. Plaintiff argues that "District was required, per the terms of his IEP, to provide R.S. with a paraprofessional capable of assisting him without inducing prompt dependency," but did not do so. *Id*. at 18. Plaintiff further argues that the District has failed to reduce this dependency, denying R.S. a FAPE. *Id*.

Other than arguing waiver as discussed above, the District does not respond to plaintiff's argument that the District failed to provided R.S. with aides capable of avoiding prompt dependency. Docket No. 20 at 14-16. Rather, the District argues that "no evidence was offered by Mrs. Smith during the due process proceeding that failure to reduce the amount of prompting resulted in a denial of FAPE and she fails to offer any 'supplemental' evidence in her Complaint or Opening Brief in this proceeding." Docket No. 20 at 16.

Because this issue is one of the alleged IDEA violations on which the ALJ

erroneously granted summary judgment, it is unsurprising that plaintiff did not develop a significant record on this issue during the administrative proceedings. As a supplement on appeal, plaintiff states in her affidavit that she expressed concern during the development of the November 2013 IEP that "there was a likelihood that R.S. could become 'prompt dependent' on one-on-one aides, and that preventative measures needed to be implemented, to assure that R.S. did not become dependent upon the prompting of his aide." Docket No. 18-5 at 2-3, ¶ 6. Plaintiff also claims to have provided the Academy with a "comprehensive report from [R.S.'s therapists], describing how prompts should be handled with R.S. so as to avoid him becoming prompt dependent, and asked that R.S.'s aide be [Board] Certified [in Behavioral Analysis]." Plaintiff claims that she was assured by Ms. Higgins that the "District was capable of implementing an aide for R.S. without R.S. becoming prompt dependent." *Id*.

In her affidavit, Ms. Higgins states generally that the "allegations [Ms. Smith] makes in [her] affidavit are incorrect and inconsistent with the facts and her actions in this matter." Docket No. 20-1 at 27, ¶ 1. She acknowledges that "it would have been a denial of a [FAPE] not to provide the 1:1 paraprofessional that the child needed." *Id*. at 29, ¶ 9. Ms. Higgins states that Ms. Smith did not express "disagreement or dissatisfaction with the evaluation or the November [2013] IEP." *Id*. at 28-29, ¶ 6. Ms. Higgins does not, however, dispute that Ms. Smith raised concerns about prompt dependency or that R.S. was provided with aides who were not special education staff or paraprofessionals as required by the November 2013 IEP. *See* Docket No. 18-4 at 15 ("[R.S.] needs intensive support for instruction and supervision for safety throughout his day . . . provided by special education staff and/or paraprofessional on an individual

and small group basis.").

The administrative record tends to support plaintiff on this issue. Ms. Higgins admitted that Ms. Smith raised concerns about R.S. becoming prompt dependent. Docket No. 25-2 at 70, ll. 5-8. Ms. Higgins also testified that the aides were not special education staff and that she did not know if they were paraprofessionals. Docket No. 25-2 at 56, ll. 13-19. Apparently uncertain about the qualifications of those providing support, Ms. Higgins and other District employees generally referred to R.S.'s aides simply as adults. *Id*. at 56, l. 25 to 57, l. 1 ("I know it was an adult that was providing support."), at 64, l. 7 ("Adult support was always in the classroom.").[11] But, while this casts doubt on whether R.S.'s aides were paraprofessionals as called for in the IEP, plaintiff provides no evidence that the aides were not paraprofessionals. The Court will not make such an inferential leap in the face of the ALJ's contrary conclusion. *See* R. at 399 ("[R.S.] was never denied the paraprofessional support required by his IEP."); *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008) ("due weight must be given to the administrative proceedings, the fact findings of which are considered prima facie correct" (internal citations and quotation marks omitted)). Nonetheless, no party disputes the ALJ's findings that Academy staff became increasingly concerned about R.S.'s prompt dependency as the school year went on and that they thought it "created an unacceptable level of dependence." R. at 393, ¶ 14 ("[R.S.'s] teachers and support staff were concerned that [R.S.] was becoming overly

---

[11] The two adults who provided support for R.S. are identified in the record, Docket No. 25-2 at 165, ll. 3-14, but the record does not appear to contain any further information about them.

dependent upon the prompting provided by his support team."). Likewise, no party disputes that, after the initial attempt to fade prompting was unsuccessful, the District did not make further efforts to address R.S.'s prompt dependence. *See* R. at 394, ¶ 22.

### 3. Predetermination of Decision

Plaintiff claims that, leading up to the creation of the May 2014 IEP, the District predetermined the level of services that it would provide to R.S. before holding an IEP meeting. Docket No. 18 at 18-20. Plaintiff argues that the "District's unilateral predetermination to not provide R.S. with the paraprofessional services called for in his IEP was an egregious procedural violation of the IDEA that seriously infringed on Ms. Smith's right to meaningfully participate in the IEP process, and constituted a denial of a FAPE to R.S." Docket No. 18 at 20.

The ALJ addressed claims that the process leading up to the creation of the May 2014 IEP was improper by dividing the issue into two parts: (1) whether the March 12, 2014 meeting was an IEP team meeting and (2) whether the District was required to provide written notice of a plan to reevaluate R.S. prior to the meeting. *See* R. at 397. The Court addresses these same issues in the context of analyzing whether the District's decision was predetermined.

### a. March 12, 2014 Meeting

IEP Team meetings are a formal process through which an IEP is developed and modified. 34 C.F.R. §§ 300.324(a)(1), 300.324(b)(1). As such, written notice is required and required IEP team members must be in attendance. 34 C.F.R. §§ 300.321(e), 300.322(b).

The ALJ found that the March 12, 2014 meeting was not an IEP Team meeting because those who attended the meeting and testified stated that it was not a team meeting and "no changes to [the] November 2013 IEP were discussed at the meeting and none were implemented." R. at 397. This conclusion is supported by the evidence and not challenged by plaintiff on appeal.

### b. Reevaluation of R.S.

Written notice must be given to the parents of a disabled child before the school evaluates (or reevaluates) the child. 34 C.F.R. §§ 300.304(a), 300.503(a). Relevant here, the notice must include a description of the proposed evaluation, an explanation of why the evaluation is proposed, a description of the procedures that will be used in the evaluation, a statement about the parents' procedural safeguards, information about who the parents can contact to understand the procedural safeguards, and a "description of other options that the IEP Team considered and the reasons why those options were rejected." 34 C.F.R. § 300.503(b). A parent must consent to the evaluation after he or she has "been fully informed of all information relevant to the activity for which consent is sought." 34 C.F.R. § 300.9; *see also* 34 C.F.R. § 300.300.

 The ALJ found that R.S.'s aides' fading of prompting was not an evaluation as that term is defined. R. at 397-98. Under 34 C.F.R. § 300.15, an "evaluation" is defined as "procedures used . . . to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs." The ALJ based this finding on testimony by Ms. Higgins that prompting is itself an instructional strategy. R. at 398; *see also* R. at 394 at ¶ 24. The ALJ analysis also relied on a clarification to the definition of "evaluation" that is provided in 34 C.F.R.

§ 300.302: "The screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services." The ALJ concluded that, because R.S.'s parents "presented no evidence to rebut Ms. Higgins' testimony that the fading plan involved only the instructional strategy used to implement [R.S.'s] IEP, and not an evaluation of his eligibility for special education or related services, . . . prior written notice and parental consent were not required." R. at 398. This conclusion is in error even if the ALJ's fact findings are assumed to be correct.

Both the definition of "evaluation" and the exception look to the purpose for which the child is being assessed. If the purpose is "to determine . . . the nature and extent of the special education and related services that the child needs," then it is an evaluation. But if the purpose is merely "to determine appropriate instructional strategies for curriculum implementation," then it is not an evaluation. The purpose of fade in R.S.'s prompting was unambiguously to determine whether he needed prompting to participate in general curriculum, not whether prompting was appropriate for R.S. As the ALJ correctly stated, the "goal" of defendant's plan to fade prompting "was to see if his related services, i.e. the intensity of his paraprofessional support, could be modified in a way that would permit him to access the general education curriculum with a degree of independence." R. at 398. In fact, this understanding of the purpose of the fading plan is spelled out in the notes from the March 12, 2014 meeting, which describe the plan as "decreas[ing] the level of adult prompting to see if [R.S.] could more independently access the general setting and remain safe." Docket

20

No. 25-1 at 49.

It is equally clear that the District was not seeking to determine whether prompting was an appropriate instructional strategy for R.S.; the District already knew that prompting was appropriate and there is no indication that the District questioned that conclusion. The November 2013 IEP calls for prompting as an instructional strategy in numerous places. *See, e.g.*, R. at 28 ("Strategies that were generally effective to improve work completion included repeating the directions with a personalized prompt."); R. at 45 ("staff may provide a verbal prompt using the first/then approach"); R. at 50. The ALJ and the District point to no evidence that the purpose of the fading plan was to reconsider the appropriateness of prompting.

The conclusion that the District's purpose was to reevaluate R.S.'s needs is reenforced by the outcome of the plan, which resulted in changes to the IEP's description of the services R.S. required. As the ALJ found, "the IEP Team discussed the results of the fading plan, including the fact that [R.S.] continued to require intensive one-on-one paraprofessional support." R. at 394, ¶ 25. Based on the results of the fading plan, the IEP team modified the IEP's services delivery statement to state that R.S. "'requires continual redirection/prompting.'" R. at 394-95, ¶ 25 (quoting R. at 73.

Because the purpose of the fading plan was to determine R.S.'s needs, not whether fading was an appropriate instructional strategy, the fading plan was an evaluation within the meaning of 34 C.F.R. § 300.15. Accordingly, prior written notice was required. 34 C.F.R. § 300.304(a). It is undisputed that the required notice and consent procedure was not followed in this case. Rather, Mr. Tran sent plaintiff an email stating that he wished to "discuss the next steps in preparation for [R.S.'s] first

21

grade year" prior to the March meeting and R.S.'s reevaluation.  Docket No. 25-1 at 48.

Plaintiff does not, however, raise this lack of notice on appeal, but instead argues that

the decision was predetermined.

### c. Predetermination

"Predetermination occurs when an educational agency has made a

determination prior to the IEP meeting, including when it presents one educational

placement option at the meeting and is unwilling to consider other alternatives." *Z.F. v.*

*Ripon Unified Sch. Dist.*, 2013 WL 127662, at *6 (E.D. Cal. Jan. 9, 2013) (citing *Deal v.*

*Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004)).  "A school district

violates the IDEA if it predetermines placement for a student before the IEP is

developed or steers the IEP to the predetermined placement."  *K.D. ex rel. C.L. v. Dep't*

*of Educ., Hawaii*, 665 F.3d 1110, 1123 (9th Cir. 2011) (citations omitted).

"Predetermination violates the IDEA because the Act requires that the placement be

based on the IEP, and not vice versa."  *Id*.  (citing *Spielberg v. Henrico Cty. Pub. Sch.*,

853 F.2d 256, 259 (4th Cir. 1988).

While the District's evaluation of R.S. to determine his needs without the

required notice and consent procedures was improper, the fact that the District

undertook an investigation undercuts plaintiff's claims that the District predetermined

R.S.'s placement or the level of services to provide R.S.  There is no evidence

indicating that, when the March 12, 2014 meeting was held, any of the participants had

predetermined where R.S. would attend school the next year or what level of services

would be called for in R.S.'s case.  Rather, as discussed above, the purpose of the

reevaluation was to determine whether R.S. could access the general curriculum with less prompting and less paraprofessional support. All available evidence points to the conclusion the District faded prompting in order to gather data that was then used to determine the required level of prompting and corresponding level of required paraprofessional support.

Plaintiff argues that improper predetermination occurred here because the District determined that it "would not provide paraprofessional support to R.S. in first grade," and plaintiff claims that whether R.S. could "receive this support in some other school district is irrelevant." Docket No. 21 at 7 (emphasis removed). While it may be true that Principal Barr had decided that he would invoke the School Choice law if R.S. required paraprofessional support during the next school year, plaintiff cites no authority that such a decision constitutes improper predetermination under IDEA. Plaintiff does not claim that the reexamination of R.S. was conducted in bad faith, i.e., that it was designed as a pretext to deny R.S. re-enrollment. On the contrary, because the November 2013 IEP already called for continuous one-on-one support, the decision to reevaluate R.S. can be seen as an attempt to determine if he could get by with less support and, thereby, remain in the District because additional staff would not need to be hired. Hence, this is not a case where the "school district had decided to change the disabled student's placement before developing an IEP to support the change," *Deal*, 392 F.3d at 857 (discussing *Spielberg*, 853 F.2d at 258-59), but rather an instance where the District evaluated a disabled student and, based on the results of the evaluation, developed an IEP that, in turn, influenced a placement decision. Thus, while the District may have made decisions about the course of action it would take

depending on the evaluation's results, plaintiff has not shown that the District violated IDEA by predetermining the placement outcome before R.S.'s evaluation and the development of the May 2014 IEP. *See N.L. ex rel. Ms. C. v. Knox Cty. Sch.*, 315 F.3d 688, 694 (6th Cir. 2003) ("[S]chool evaluators may prepare reports and come [to an IEP meeting] with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.").

### 4.  R.S. Was Not Denied a FAPE

Having addressed plaintiff's claims individually, the Court turns to the ultimate question of whether plaintiff has met her burden to show that R.S. was denied a FAPE. As discussed above, the November 2013 IEP was not defective because it addressed R.S.'s behaviors resulting from disabilities other than autism.  While it is clear that R.S. became more prompt dependent during the 2013-14 school year, there is no evidence that becoming more prompt dependent prevented R.S. from receiving an appropriate education.  Rather, it is apparent from the November 2013 IEP and record evidence that prompting was intended as an instructional strategy to allow R.S. to access the general education curriculum.  And prompting fulfilled this role and allowed R.S. to respond to teacher instructions and benefit from the general curriculum.  At the time, plaintiff viewed the fade of prompting as a loss of an educational benefit to R.S. and resisted the plan on that basis.  R. at 38 ("Since [R.S.'s] individual support has been faded, there has been a dramatic decline in both the quantity and quality of his schoolwork, and I have serious concerns about [R.S.'s] safety and his ability to receive an appropriate education if the support called for in his IEP is unilaterally withdrawn.").

24

The way that the District initiated the reevaluation of R.S. by fading prompting was procedurally improper, but this failing does not rise to the level that it alone can be considered to have denied R.S. a FAPE. *See Urban by Urban v. Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 726 (10th Cir. 1996) ("Technical deviations from the requirements of section 1401(a)(20), such as the failure to include a statement of transition services, do not render an IEP entirely invalid; to hold otherwise would exalt form over substance." (internal quotation marks omitted)); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625 (6th Cir. 1990) (finding the failure to provide a parent with written notice of an IEP meeting was error of "technical noncompliance which did not result in any substantive deprivation").  Notably, plaintiff did not oppose the decision to continue to include prompting as an instructional strategy in the May 2014 IEP or seek to have prompting reduced thereafter.  Essentially, the reevaluation reaffirmed the conclusion memorialized in the November 2013 IEP that prompting was an appropriate instructional strategy to assist R.S. in accessing the general curriculum.  Ideally R.S. would have received support that would have allowed him to engage in his general education classroom without becoming more dependent on prompts to do so.  "But Congress simply did not guarantee children 'a potential-maximizing education.'" *Thompson*, 540 F.3d at 1154 n.11 (citing *Rowley*, 458 U.S. at 197 n.21); *see also O'Toole*, 144 F.3d at 701("Neither the statute nor reason countenance Monday Morning Quarterbacking in evaluating the appropriateness of a child's placement." (internal quotation marks omitted)).  Rather, IDEA is intended to allow a disabled student to make "progress appropriate in light of [his] circumstances."  *Endrew F.*, 137 S. Ct. at

999.  Here, as the ALJ found, the evidence shows that, "[a]lthough [R.S.] did not achieve all of his November [2013] IEP goals, he made significant progress toward those goals, both socially and academically."  R. at 395, ¶ 27.  Ultimately, the Court finds that R.S. was not denied a FAPE.

## VI.   COMPLIANCE WITH RULE 5.2

The Court has determined that several filings in this case violate Federal Rule of Civil Procedure 5.2(a).  The Court will order such filings restricted.

## VII.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff's claims are **DISMISSED**.  It is further

**ORDERED** that Defendant Cheyenne Mountain School District 12's Motion for Summary Judgment [Docket No. 26] is **DENIED**.  It is further

**ORDERED** that Defendant Cheyenne Mountain School District 12's Request for Telephone Status Conference [Docket No. 30] is **DENIED** at moot.  It is further

**ORDERED** that Docket Nos. 18-4, 25, 25-1, and 25-2 shall be restricted at Level One.  It is further

**ORDERED** that this matter is closed.


DATED March 6, 2018.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge